Norman A. ROSS, Plaintiff,

v.

**KANSAS CITY POWER AND LIGHT COMPANY, Defendant.**

No. 98–0674–CV–W–3.

United States District Court,
W.D. Missouri,
Western Division.

April 9, 2000.

Dennis E. Egan, Bert S. Braud, The Popham Law Firm, Kansas City, MO, Dirk Hubbard, John Klamann, Klamann & Hubbard, P.A., Overland Park, KS, Michael R. Fletch-

er, Sanders, Simpson, Fletcher & Smith, P.C., Kansas City, MO, for plaintiff.

James Randall Coffey, Leonard Singer, Bioff, Finucane, Coffey & Holland, LLP, Kansas City, MO, for defendant.

## ORDER ADOPTING IN PART MAGIS-TRATE JUDGE'S REPORT AND RECOMMENDATION

SMITH, District Judge.

### I. BACKGROUND

On August 13, 1998, the Court issued an order that, *inter alia,* included the Tenets of Professional Courtesy adopted by the Kansas City Metropolitan Bar Association as an attachment. The order declared, in capitalized letters, that COUNSEL SHOULD BE AWARE THAT THE COURT EXPECTS ADHERENCE TO THE TENETS BY ATTORNEYS APPEARING IN THIS DIVISION. FURTHER, THE COURT BELIEVES IT TO BE IN THE INTEREST OF ALL CONCERNED FOR PARTIES TO BE AWARE OF THE COURT'S EXPECTATION. The order also instructed counsel to forward copies of the tenets "to all clients involved in this action." Included among the tenets are directives prohibiting "unfounded accusations of unethical conduct about opposing counsel" and requiring lawyers to "seek informal agreement on procedural and preliminary matters," "make all reasonable efforts to schedule matters with opposing counsel by agreement," and "maintain a cordial and respectful relationship with opposing counsel."

This order is routinely issued in all cases in order to set the tone early, and to provide guidance as to the Court's views on appropriate attorney behavior. Usually, this is all that is necessary to insure civility and cooperation among lawyers appearing in this division. Regrettably, this case has been the exception. A multitude of problems developed during discovery, leading (on April 1, 1999) to the issuance of an order that, *inter alia,* "sadly observes that the parties have not taken heed of the August 13, 1998 Order, in which the Court provided counsel with copies of the KCMBA's Tenets of Professional Courtesy and clearly announced its expectation that all lawyers abide by its terms." Elsewhere in that order, while responding to the parties' complaint about their inability to schedule depositions, the Court declared that it would "not ... order Plaintiff to schedule the depositions for those witnesses Plaintiff's counsel represents; the Court should not have to do this .... [T]he Court expects the parties to cooperate, act in a civilized manner, and do those things they know they need to do." In this order, and during the course of numerous telephone conferences, the Court reiterated its dismay at having to micromanage the discovery process.

Normally, attorneys eventually take the hint; not so in this case. As a general observation, it appears that Defendant[1] seized upon the Court's desire that the parties get along by doing the opposite—thereby forcing Plaintiff to either (1) race to the Court and risk appearing demanding and difficult or (2) accept Defendant's stonewalling. Examples of this strategy in action (some of which are discussed later in this order) include (1) narrowly interpreting perceived ambiguities in court orders in its favor, (2) refusing to agree to extensions, (3) improperly directing witnesses not to answer deposition questions, (4) not agreeing to minimal increases in the number of depositions, and (5) simply not providing discovery. Plaintiff's attorneys, for their part, tended to issue discovery requests or pose deposition questions that were so broadly/poorly phrased that Defendant could not understand them—and then grow furious when the desired information was not produced. Plaintiff also lodged serious ethical charges against Defendant's attorneys that not only proved groundless but, more importantly, for which Plaintiff had no just cause making in the first instance.

As stated, these matters will be discussed in greater detail throughout the remainder of this Order. At any rate, the undersigned became so shocked and dismayed by the

---

**1.** All references to Defendant or Plaintiff are intended as a reference to one or more of the attorneys representing the party in question; there is no indication that the parties were directly responsible for any of the conduct in question.

nature and number of discovery disputes that besieged this case that the matter was referred to the Honorable John T. Maughmer, Chief Magistrate Judge for this district, so that he could conduct a hearing and issue a Report and Recommendation. Specifically, Judge Maughmer was asked to discuss whether:

1. Defendant failed to fully, completely and in a timely fashion, produce documents and witnesses as ordered by the Court.

2. Defendant improperly raised claims of privilege (including claims of privilege for which no privilege log exists as required by Rule 26) in order to delay or frustrate discovery.

3. Defendant truthfully and accurately represented the unavailability of Mike Craig on July 7, 8, and 9.

4. Plaintiff conducted discovery diligently or whether Plaintiff's inability to complete discovery within the allotted time limits was a circumstance of his own making.

5. If discovery abuses occurred, whether sanctions are appropriate and/or further limited discovery should be permitted.

6. If discovery abuses did not occur, whether sanctions should be imposed for wasting the Court's (and opposing counsel's) time and energy.

Judge Maughmer conducted hearings in August 1999 and issued his Report and Recommendation (the "Report") on February 4, 2000. Generally speaking, Judge Maughmer concluded that:

1. Defendant was not particularly responsive (or concerned about being responsive) to discovery requests and court orders regarding same.

2. Plaintiff tried to compress too much discovery into too little a time period.

3. Defendant did not improperly raise claims of privilege in order to delay or frustrate discovery.

4. Defendant was not overly diligent in arranging for Mike Craig's deposition, but Defendant did not go so far as to intentionally conceal Craig's availability.

5. Both parties bear roughly equal responsibility for failure to complete discovery in a timely manner.

6. Plaintiff raised serious charges of unethical (if not criminal conduct) on the part of Defendant's lawyers that were not justified in light of the information available to Plaintiff.

Judge Maughmer recommended that the Court concur with these findings, and in addition recommended that the Court (1) require Defendant to certify that all withheld discovery documents were properly identified in privilege logs, (2) impose sanctions upon Plaintiff for making serious and baseless charges of improper conduct, (3) not reopen discovery, but require the parties to certify that all outstanding discovery requests and court orders have been honored.

Plaintiff filed objections to the Report. The primary objections focused upon Judge Maughmer's factual conclusions regarding Mike Craig's and Lori Hester's depositions, the inappropriateness of imposing sanctions on Plaintiff and the failure to sanction Defendant. The Court has conducted a de novo review of the record, which includes not only the material presented to Judge Maughmer and the transcript of the hearing he conducted, but also the files related to the lawsuit that brought everyone together in the first place. The Court agrees with Judge Maughmer's findings (and has some additional findings of its own) but has opted to respond in a different manner than he suggested.

## II. DISCUSSION

A. Did KCP & L fail to fully, completely and in a timely fashion produce documents and witnesses ordered by the Court?

Judge Maughmer answered this question in the affirmative. There is little dispute with his finding in this regard, so there is no need for the Court to engage in an exhaustive review of the record in this matter. Nonetheless, a brief examination is in order because the Court is not willing to

excuse Defendant's part in the difficulties that have plagued this case.

Judge Maughmer described the discovery process as "an arduous and painful journey" and found that "the fault for this journey lies with both parties," Report at 5, but the focus here is on KCP & L's contribution to those difficulties. In that regard, it is worth noting that on April 1, 1999, the Court ordered Defendant to deliver certain surveys to Plaintiff, along with the underlying data. However, by the time of Judge Maughmer's hearing, Defendant had not delivered certain codes necessary to Plaintiff's understanding of the information supplied. In addition, KCP & L unilaterally decided that two provisions of the April 1, 1999 Order were inconsistent and further unilaterally decided how to deal with that situation. One provision directed KCP & L to provide Plaintiff with annual surveys and data comparing pay of African–American workers to the pay of Caucasian workers; the other provision instructed Plaintiff's counsel not to ask, *during depositions*, for pay information regarding management and human resource employees. Instead of asking the Court to resolve the alleged confusion, KCP & L resolved this ambiguity in its favor—thereby forcing Plaintiff to return to Court if it wanted the discovery it (correctly) believed it was due. Judge Maughmer noted one reason why this tact was inappropriate: the undersigned has, in both writing and orally, emphasized that it has a very broad view of discovery. The undersigned notes another problem with KCP & L's actions: they are premised on the facially faulty conclusion that the two directives are in conflict. There is nothing contradictory about telling a defendant to provide documentary information while at the same time prohibiting plaintiff from inquiring about the topic in a deposition. Here, the Court issued these rulings to avoid having employees personally provide private information about themselves—a concern that was not implicated by having Defendant provide documentary information. That this was the Court's reasoning should not have

been in doubt because this was the basis for Defendant's request that the deposition questions should not be asked. Defendant requested a narrow ruling, received it, then increased its breadth.

It should also be noted that Judge Maughmer found Defendant was slow to deliver discovery responses; in fact, some responses had not been delivered by the time of the August 1999 hearing. The delay itself is disconcerting; the lack of apparent effort to timely accomplish delivery is also inexcusable.

B. *Did KCP & L improperly raise claims of privilege (including claims of privilege for which no privilege log exists as required by Rule 26) in order to delay or frustrate discovery?*

■ Judge Maughmer's discussion suggests KCP & L was careless (and perhaps uncertain) with regard to whether documents were or were not privileged and whether KCP & L could or could not satisfy the dictates of Rule 26. The Court agrees with Judge Maughmer's conclusions. However, carelessness is not indicative of intent; the Court holds that KCP & L did not improperly raise claims of privilege for the purpose of delaying or frustrating discovery.

C. *Did KCP & L truthfully and accurately represent the unavailability of Mike Craig on July 7, 8 and 9?*

■ Judge Maughmer concluded that KCP & L's counsel did not "act[ ] intentionally to conceal Craig's availability in an effort to thwart his deposition. . . . [T]he credible evidence does not support the conclusion that counsel for defendant KCP & L acted with such intentional disregard for the process of justice." Report at 13–14. Plaintiff strenuously disagrees with this finding, but the Court agrees with the Report.[2]

Discovery in this case was due to close on July 9, 1999. On June 28 one of Defendant's attorneys, Randall Coffey, wrote a letter to Plaintiff's counsel discussing several deposi-

2. Plaintiff's suggestion that Judge Maughmer acted incorrectly by excusing "unintentional" misstatement is summarily rejected. The Court is not concerned about unintentional misstate-

ments. The Court is concerned about intentional falsehoods designed to thwart discovery. (Besides, this is what Plaintiff has alleged occurred).

tions, including Craig's, Exhibit 3(8). With respect to that deposition counsel wrote "I will have to contact KCPL regarding the additional witness that you want to depose, Mike Craig. I will let you know tomorrow when he will be available." After June 28, but definitely on or before July 1, Craig told either Coffey or another of KCP & L's lawyers (Bob Gingrich) that he would be unavailable July 6 and July 9 (the following Tuesday and Friday) because he would be attending meetings in Lawrence, Kansas related to a potential merger. Craig testified he relayed the information about his availability to Gingrich. Craig Depo. at 10–11. Coffey told Judge Maughmer that he personally talked to Craig on July 1 (which was a Thursday) and told Craig that Plaintiff wanted to depose him but he "was not certain when it could be scheduled due to the fact that we were having disputes about the number of depositions and the fact that we already had seven depositions scheduled for the last week of discovery...." Tr. at 102.[3] Either way, there is no disputing that Craig told somebody on Defendant's legal team he was not available on July 6 or 9.

The dispute about the number of depositions to which Coffey referred stems from the Court's April 1 Order—or earlier, if one believes that lawyers should be aware of the limits on discovery imposed by the Federal Rules of Civil Procedure. In the April 1 Order, the Court reminded the parties of the limits imposed by Rule 30(a)(2)(A), which declares that leave of court or stipulation of the parties is required if "a proposed deposition would result in more than ten depositions being taken...." Despite the Rule's dictates—and the Court's reminder of those dictates—Plaintiff never sought (and therefore never obtained) judicial permission to exceed ten depositions. There is no indication as to whether Plaintiff sought a stipulation from Defendant, but subsequent events (detailed below) make clear that Defendant

was not willing to enter a stipulation increasing the number of depositions.

On July 2, 1999, Plaintiff's counsel telefaxed a letter to Coffey confirming the scheduling of the remaining depositions. Among the depositions listed was that of Bruce Knodel, which was scheduled for July 9. Craig's deposition was not listed because the parties had not agreed on a time and date for it to take place. Coffey responded via fax that same day and (with the exception of the time for two of the depositions) concurred in the schedule. Coffey also wrote the following:

As I indicated in my letter of yesterday, plaintiff has exceeded the limit of ten depositions to which the Court referred the parties in its April 1, 1999 Order. KCPL, therefore, will not be producing other witnesses absent an order by the Court that it do so.

Plaintiff's counsel responded on July 6:

This fax is with regard to your fax of Friday and Defendant's refusal to produce other witnesses beyond the standard ten depositions. Since Plaintiff has not, to date, deposed ten individuals, please substitute Mike Craig for the deposition we have scheduled for Bruce Knodel. Accordingly, please provide dates for Craig's deposition as soon as possible.

Coffey responded via letter the next day, advising Plaintiff's counsel that he would let him know as soon as he heard back from Craig regarding his availability. Coffey left phone messages for Craig and Craig left the following phone message for Coffey at approximately 4:20 p.m. on July 7:

Hey Randy, this is Mike Craig. We've been playing phone tag. I've been in Lawrence all day today and just now getting back in ... so ... ummmmm ... You can, let's see here, I'll be here tomorrow, but I'm back in Lawrence probably on Friday. So, well, we will try to hook up. Alright. Bye.[4]

---

3. "Tr. at___" is a reference to the transcript of the hearing before Judge Maughmer.

4. Plaintiff insists the call must have been made on July 6 because the message indicates Craig was in Lawrence the day the message was left for Coffey and it is known that Craig was in Lawrence on July 6. Furthermore, Craig testified that

he was "available" on Wednesday, which would contradict the message's indication that he was in Lawrence on the sixth. Craig Depo. at 13–14. However, if the message was left on the sixth and indicates Craig's availability "tomorrow" (the seventh) and unavailability on Friday (the ninth), the message curiously omits any indication as to

On July 8, Coffey again wrote Plaintiff's counsel, saying:

> In regard to the deposition of Mr. Craig, who you indicated on Tuesday that you would like to substitute for the deposition of Mr. Knodel, who was scheduled for Friday, July 9, Mr. Craig contacted me late yesterday and left a voice mail indicating that [he] will be out of town all day on July 9. I am sorry that we are unable to schedule his deposition prior to the close of discovery due to the lateness of your request.

Finally, of crucial importance is the fact that Coffey and Craig played "phone tag" July 6–8 and never personally spoke. Craig Depo. at 13–14; Tr. at 103. This fact is crucial because after Craig told KCP & L's lawyer that he would be unavailable on July 9, the meeting in Lawrence was canceled and he never related that fact to counsel. Craig Depo. at 11–12, 14. Meetings were conducted on July 9, but they were held in Kansas City and not Lawrence. Craig Depo. at 14. Plaintiff independently discovered that Craig was in Kansas City on July 9 and deposed him that day, but there is no indication that Coffey knew Craig was available for his deposition that day. The fact that Craig and Coffey did not speak during this time period is also significant because even if Craig was also available on July 7 or 8, Coffey had no way to (1) confirm this fact, (2) determine a specific time on those days when Craig could be deposed or (3) instruct Craig to appear for the deposition.

The sequence of events raises a variety of concerns for the Court.

1. Could Plaintiff have averted this last-minute maneuvering by appropriately responding to the fact that it wanted to take more than ten depositions?

2. Could Defendant have been more accommodating by, for instance, agreeing to more than ten depositions and/or agreeing to a minimal extension of the discovery deadline?

3. Could Defendant's counsel have made a more diligent effort to contact Craig, particularly in light of (a) his prior knowledge that Craig was somebody Plaintiff wanted to testify and (b) his unwillingness to be flexible with the discovery deadline?

The answer to all of these questions is "yes." In other words, both sides have combined lack of planning and gamesmanship to create unnecessary problems. Diligent attention to resolving matters in a civil manner would have averted much of this crisis.

As dismayed as the Court is by the conduct in question, the critical question has not been addressed; namely, did Coffey truthfully and accurately represent Craig's availability? The Court concludes that the answer to this is a qualified "yes." Coffey did not put forth a particularly diligent effort, but he conveyed information that was accurate as far as he knew. However, as stated earlier, the Court's concern is determining whether Coffey intentionally misrepresented Craig's availability in order to frustrate or delay discovery, and the Court is convinced that Coffey's failure to provide accurate information that was not in his possession was neither intentional nor for the purpose of preventing Craig from being deposed.

In addition to the criticisms expressed above, the Court directs an additional one toward Plaintiff's counsel for, essentially, raising unjustified accusations. On July 9—after learning Craig was in Kansas City but prior to deposing him—Plaintiff's counsel charged that Coffey was trying to "hide" Craig to prevent his deposition. Before Judge Maughmer, Plaintiff's counsel argued that Coffey already knew that Craig was available on July 7 and 8, so his July 7 communication indicating that he would check on Craig's availability was a ruse designed to further stall Craig's deposition until the discovery deadline passed. Plaintiff's suspicions were never justified. There has never been any doubt that KCP & L had been involved in merger negotiations and

Craig's availability on the eighth. The Court doubts that a person relating their schedule would discuss the following Wednesday and Friday and omit reference to the intervening Thursday—which suggests that "tomorrow" referred to Thursday and the message was left on Wednesday (the seventh).

that (1) some of those discussions took place in Lawrence and (2) Craig was involved in those discussions whenever and wherever they occurred. It is true that Coffey had information that Craig was available on July 7 and 8—but that information was nearly a week old. Given that Craig's deposition was not scheduled when that information was fresh, it was reasonable for Coffey—as it would be for any lawyer—to reconfirm a witness' schedule before committing the witness to a deposition on those dates. Moreover, even if Coffey had solid, unquestionable information that Craig was available on those days, this did not mean that Craig was necessarily available at all times on those days. Coffey—and any other lawyer in a similar circumstance—would understandably desire to check with Craig about the times he was available on those days. These are common concerns and actions of attorneys, and Plaintiff's counsel lacked even an arguable basis for believing or complaining that Coffey acted unethically or criminally.

*D. Did Plaintiff diligently conduct discovery or was Plaintiff's inability to complete discovery within the allotted time limits a circumstance of his own making?*

In discussing this question, Judge Maughmer declared that it is "a close question" and that each parties' placement of responsibility on the other has "significant merit." Judge Maugher ultimately concluded that "both parties bear roughly equal responsibility for the failure to complete discovery within the allotted time limits." Report at 17. Neither party objects to this finding and the Court adopts Judge Maughmer's findings and conclusions in this regard.

*E. If discovery abuses have occurred are sanctions appropriate and/or should further limited discovery be permitted?*

■ There is no serious dispute that discovery violations have occurred. The Court concludes that further discovery is not warranted. The Court has reviewed numerous depositions and other materials as they relate both to the parties' discovery problems as well as Defendant's Motion for Summary Judgment. The Court has already ruled upon the Motion for Summary Judgment and, in that context, has concluded that further discovery is not justified because further discovery will not alter the basis upon which summary judgment has been granted.

The Court granted Defendant judgment on Plaintiff's claim of racial harassment because the incidents Plaintiff complained of in his deposition did not constitute harassment and/or occurred outside the time limitation period and were not actionable on a continuing violation theory. Further discovery is not going to add to the number of harassing incidents Plaintiff witnessed or experienced. Plaintiff's claim of discriminatory pay was disposed of because Plaintiff was paid pursuant to a collective bargaining agreement that was a product of negotiations between Plaintiff's union and KCP & L, and Plaintiff failed to suggest any basis for concluding pay differences based on seniority were a pretext for discrimination. Plaintiff identified no additional discovery that would bear on this dispositive issue. Plaintiff's claim of discrimination in the awarding of opportunities to "step-up" failed because there was no dispute that (1) Plaintiff initially told his supervisors that he did not want to step-up and (2) years later, when Plaintiff asked for opportunities to step-up, he was allowed to do so within a matter of months (when the third such opportunity arose). Further discovery about KCP & L's step-up practices during the time Plaintiff disavowed any interest in stepping-up won't aid his claim; even if those practices were discriminatory the record conclusively established that Plaintiff voluntarily elected not to be considered for such opportunities. Finally, Plaintiff's claims of retaliation were abandoned.

The only claim to survive Defendant's Motion for Summary Judgment was Plaintiff's claim of discriminatory denial of promotions. However, the Court is not aware of any outstanding discovery requests that relate to this claim. The Court is also not aware of any unissued discovery requests that Plaintiff desires to issue that relate to this claim (which, in any event, would likely be met with disfavor by the Court because they were not issued within the discovery period).

For these reasons, reopening discovery is not warranted. Similarly, because any as-yet unanswered discovery requests relate to dismissed claims, the Court deems it inappropriate for Defendant to be ordered to respond to the requests at this juncture. The Court does not take lightly Defendant's part in the painful process of discovery. The Court also does not want to encourage parties to withhold discovery requests on the chance that they can obtain a judgment for unrelated reasons and thereby avoid their obligations. However, it would be unreasonable to order Defendant to produce discovery that is relevant only to dismissed claims, and the Court's concerns can be resolved by other means.

*F. If discovery abuses have not occurred should sanctions be imposed for wasting the Court's (and opposing counsel's) time and energy?*

 Just as there is little doubt that discovery abuses occurred, there is also little doubt that some alleged abuses did not occur. These unproven allegations are particularly troublesome, given that the allegations charged conduct that qualifies not only as discovery violations but also unethical (if not criminal) conduct.

Plaintiff's attorneys seem to have softened their stance somewhat in the face of Judge Maughmer's Report, suggesting they were obligated to bring the matter to the Court's attention even though it was ultimately determined that no misconduct occurred. The Court agrees with this general proposition, but disagrees with counsel's contention that a reasonable basis for making the charges exists.

One example involves Craig's deposition, which has already been discussed at length. Charges that Coffey was "hiding" Craig when he said he wanted to check Craig's week-old statements about his schedule are incredulous. Similarly, knowing someone is available on a given day does not automatically mean that the person is available at all moments during that day. The leap from "checking Craig's schedule" to "hiding Craig" was unjustified.

Another example centers on allegations involving Robert Gingrich. The Court addressed these allegations in its April 1 Order, and relevant portions of that discussion are repeated here:

The original complaint in this case [raises] various claims of discriminatory treatment on behalf of an employee-class. During the deposition of Plaintiff's supervisor (Jim Murray), it was revealed that the business day after this suit was filed one of Defendant's in-house attorneys (Robert Gingrich) approached Murray and asked to see Plaintiff's personnel file. Murray Depo. at 13–14. Gingrich asked for and received permission to take a few documents out of the file and took "four or five documents." Murray Depo. at 14. As of the date of the deposition (February 18, 1999) Gingrich had not returned the documents to Murray, nor is there any apparent means by which Gingrich could return the documents to the file without Murray's knowledge.[5] Murray Depo. at 14–15. Murray then answered affirmatively when asked whether it was after "Gingrich removed these documents from Mr. Ross' files that he then asked you if you would look favorably upon this if [Defendant] did not oppose your [Murray's] unemployment compensation benefits that you were seeking, correct?" Murray Depo. at 18–19. This question is obviously predicated on some event that is known to the parties, but no information beyond that contained in counsel's question has been provided to the Court.

At this time, the following question was asked and answer given:

Q: When Mr. Gingrich removed the documents from Mr. Ross' files did he say anything else to you that you have not told us about, Mr. Murray?

A: After that I asked Bob, I believe I asked Bob, how serious is this and his response was well, the first thing we

---

5. Murray was discharged at an unspecified point in time, so the fact that he did not know that the documents were returned to the file is not conclusive as to whether the documents were or were not returned.

need to do is make sure that this does not attain class action status.

Murray Depo. at 19. Defendant's counsel interposed an objection "to any further questions relating to conversations that Mr. Murray had with Mr. Gingrich." Murray Depo. at 19.

Plaintiff argues that he should be allowed to ask additional questions about comments made by Gingrich to Murray. There appears no dispute that, in ordinary circumstances, such comments would be protected by the attorney/client privilege. Plaintiff contends that the privilege does not apply because (1) no legal advice was sought or given, (2) Gingrich was spoliating evidence, and/or (3) the privilege was waived before a timely objection was made. The Court rejects all three of Plaintiff's arguments and concludes the information sought is protected by the attorney client privilege.

\* \* \* \* \* \*

Defendant's assertion that Gingrich was secreting or destroying evidence, or engaging in any other improper behavior, is simply not supported by the record. There is nothing noteworthy in an attorney examining the file of an employee who has just filed a class-action against the attorney's client, nor is there anything unusual in an attorney taking documents that he or she deems necessary or useful in evaluating or defending the lawsuit. Certainly, such actions can be the prelude to more sinister conduct, but there is no indication that spoliation, concealment, or any other improper activity occurred.

Plaintiff focuses upon Gingrich's statement indicating that Defendant wanted to prevent the case from being certified as a class action, but the Court sees nothing remarkable in this statement. It suggests nothing improper, and actually expresses the expected sentiments of any lawyer defending a potential class action lawsuit. Gingrich's statement does not demonstrate

that he was engaging in improper means to accomplish Defendant's obvious and expected legal goals.

Despite the resolution of this issue, Plaintiff presented it as the very first topic of discussion before Judge Maughmer. Tr. at 8. Counsel failed to mention to Judge Maughmer that the matter had been resolved by the Court in the April 1 Order, and Judge Maughmer found this omission disturbing. Report at 3–4. Plaintiff's attorneys contend they did nothing wrong because they had presented Judge Maughmer with, among other things, a copy of the orders in this case, and Judge Maughmer indicated that he had read the prior orders. This does not make counsel's omission acceptable. First, the matter had already been resolved and the issue was closed: there was no reason to revisit the issue. Second, candor to the Court required counsel, during the course of his *oral* presentation, to *orally* mention the existence of a prior order that directly discussed and addressed the point under discussion.

Plaintiff's counsel contended that Defendant's counsel intimidated Lori Hester (among other actions) in order to keep her from testifying truthfully. The facts demonstrate no support for even suspecting the possibility that these serious charges were true.

Defendant did not believe Hester possessed information about Ross' case.[6] In December 1998 Gingrich presented Hester with an affidavit designed to provide a basis for asking the Court to quash Hester's deposition. Hester reviewed the affidavit and told Gingrich some changes had to be made before she could sign it. Tr. at 193. The affidavit was changed and presented to Hester; she signed it but has not seen it since. *Id.* The affidavit was not used for its intended purpose and it was never introduced in evidence before Judge Maughmer, so the Court does not know what it says. Most importantly, there is no indication that Plain-

---

**6.** The Court sees a substantial basis for Defendant's view. The Court has reviewed both volumes of Hester's deposition and sees little effort by Plaintiff's counsel to ask questions likely to lead to evidence relating to Plaintiff's case. In fact, when asked whether she knew Plaintiff Hester testified "Not personally. I have met him once in the hallway. Seen him maybe twice in the hall." Hester Depo., Vol. II, p. 4.

tiff's counsel knows what it says.[7] When asked why she was uncomfortable with the affidavit, Hester testified that it contained "statements such as I had never, ever witnessed or heard any derogatory comments about minorities, and, of course, I said, Bob, I can't make that statement." Tr. at 208–09. Judge Maughmer asked if that description applied to the first affidavit or the second affidavit, but Hester (after initially answering this question) professed confusion about what she had been asked. Tr. at 210. Hester then testified affirmatively when asked by Plaintiff's counsel whether she "had shared with Mr. Gingrich things [she] knew concerning discrimination before he presented [her] with the affidavit that [she] said was inaccurate." Tr. at 210.

From this, Plaintiff concludes that Hester "testified that she had told counsel ... that she indeed 'had' witnessed" discrimination, he nevertheless presented her with an affidavit that "read in a way that it would state that I've never seen or heard anything." Plaintiff's Objections at 15. This is not what Hester said; Plaintiff has taken scattered portions of Hester's testimony to convey a claim that is not supported. First, it is not clear in what respect the first affidavit was false because the record does not establish what it says. Second, given Hester's confusion in the hearing, it is not clear exactly when she told Gingrich that she was aware of discriminatory events. Finally, the Court notes that a clearer statement of events appears in the second volume of Hester's deposition, which was taken before Judge Maughmer's hearing took place: [8]

Q: When were you asked to sign that affidavit?

A: I think it was around the first of December.

Q: Tell the jury what you recall that affidavit stated.

A: It was, in general, that I had no knowledge of Norman Ross or any—any knowledge of anything that would—regarding Norma Ross or statements made about minorities or anything that would be of—I can't remember all the—but it was generally like that.

Q: And you were asked to sign that affidavit?

A: Yes.

Q: Now. Ms. Hester, given the fact that you have knowledge that Steve Stovall met with attorneys concerning a race claim, and that Steve Stovall was given a retroactive incentive award, and given your other testimony in this case, being asked to sign that affidavit would, in fact, be asking you to make a statement that was untrue, correct?

\* \* \* \* \* \*

A: No. I don't remember the exact wording, but it was worded to where it was factual that I could sign it because it didn't specifically ask a question that would have included Steven. It was general, just anything related to Norman. And general statements and things like that I don't have any witness to.

Hester Depo., Vol. II at 102–03. Thus, as of March 16, 1999, Plaintiff's counsel knew (at best) that (1) Hester was given an affidavit to sign, (2) it contained statements that she did not believe were true, (3) she was given a second affidavit to sign and (4) it was accurate so she signed it. Hester made clear in her deposition (as she did later in front of Judge Maughmer) that her requests to change the affidavit were honored to her satisfaction. Plaintiff's counsel had no basis for concluding that anything untoward occurred, and there was no basis for leveling the charge five months later in front of Judge Maughmer.

With respect to the charge of intimidation, Plaintiff seizes upon Hester's testimony that prior to her deposition she was instructed

---

7. Plaintiff finds much sinister significance in the fact that Defendant made several objections (including based on attorney-client privilege) that Judge Maughmer sustained. The undersigned does not.

8. Hester's deposition took place on February 17 and was resumed on March 16.

[t]hat I needed to listen to every word closely, and if the word was not exact, that I had to make sure that every word was exact, or I could not answer, and unless I was there, that I should not give information, and that I shouldn't help them, even though I know the nature of the question, and that I needed it to limit it to a "yes" or a "no."

Tr. at 196. When asked whether she was told to be evasive, Hester responded:

Evasive was the result. I can't remember if that was the exact word said to me. It was do not help them. Do not answer. You cannot answer unless—I was given example questions. In other words, here, if this question is asked this way, this is how the answer should come out, and I was terribly confused, and I thought, you know, it was a very—I was sick. I was physically sick after that.

Tr. at 196–97. Hester further testified that "technically, every answer is correct" but thought her answers were incomplete. Tr. at 198. She contacted Gingrich and expressed a desire to change some of her answers; she initially stated that she "had no response back," Tr. at 204, but also declared that Gingrich told her not to make any changes without talking to him first, Tr. at 211, that she received an e-mail from Coffey, Tr. at 207–08, and that she and Coffey played "phone tag." Tr. at 208. She also explained that she understood her deposition answers were to be truthful and that she was not to volunteer information or speculate. Tr. at 207.

A fair reading of the testimony suggests that Hester was given advice that is routinely given to would-be deponents: answer truthfully, do not guess at answers, make sure the question is understood, do not volunteer information beyond that which is necessary to answer the question. This hardly constitutes counseling a witness to evade or withhold information. All witnesses are expected to answer truthfully, understand the question, and refrain from guessing at or volunteering facts. Hester undoubtedly thought she had more information that might be helpful to Plaintiff; whether this is true or not is unclear, but even if it is true this does not mean she gave incomplete answers to the questions she was actually asked. Hester conceded that her answers were accurate; if questions necessary to draw additional relevant information from Hester were not asked, this is not Defendant's fault. Ultimately, Plaintiff had no basis for charging that Defendant coerced Hester into withholding information or answering falsely.

Finally, Plaintiff suggested that KCP & L was engaged in the shredding of documents that could serve as evidence in this case. Plaintiff's counsel leveled this charge based on his discovery of a post-it note written by JoAnne Alexander stating as follows:

Vernice,

Is this already in the internal invest (IATAN) file? If so pls. shred.

Counsel did not know (1) when it was written (2) what it referred to or (3) what it meant. Although inartfully worded, it suggests that if the document to which the post-it note was attached was already in the investigation file, then the copy to which the post-it was attached could be destroyed (there being no need for the duplicate). Armed with no information beyond the post-it note itself, Plaintiff leapt to the conclusion that Alexander's purpose was to destroy all copies of the document to which the post-it note was attached. Tr. at 172–73. This unfounded assumption proved incorrect. Tr. at 173–74; Exhibit 29.

As stated earlier, Plaintiff contends there was a reasonable basis for the accusations. As detailed above, this is not true. Plaintiff lodged charges of ethical and criminal violation without a reasonable basis for doing so.

### G. Counsels' conduct during depositions

Judge Maughmer was not asked to address counsels' conduct during depositions, it being unnecessary given that the depositions have been submitted to the Court in connection with various motions. The Court has reviewed the submitted depositions. Inasmuch as the topic of discussion includes counsels' conduct (and the propriety of sanctions), the Court deems it appropriate to condemn the numerous instances of unprofessional, rude and boorish behavior. A few examples follow:

*Hester Deposition, Vol. I at 8–10*

Q: When you were passed over for the job, did you feel that your gender had a basis [sic]?

Mr. Coffey: Were you finished with your question?

Mr. Fletcher: Are you going to tell her not to answer it?

Mr. Coffey: Were you finished with your question?

Mr. Fletcher: This is going to be fun.

Q: Did you feel, when you were passed over for the job that Mr. Scheirman obtained, that your gender played a role in your being passed over?

Mr. Coffey: I am going to direct the witness not to answer that question.

Mr. Fletcher: We are going to get the judge on the phone right now.

Mr. Coffey: All right.

Mr. Fletcher: Actually, we will wait. We are going to have several of these that we will take it up with the judge.

\* \* \* \* \* \*

Mr. Fletcher: You say you are going to move for a protective order. Do you have that motion in front of you?

Mr. Coffey: I don't have to have that motion in front of me. I am entitled under Rule 30(d)(3) to adjourn the deposition—

Mr. Fletcher: Are you going to adjourn the deposition?

Mr. Coffey: Sir, please don't interrupt me while I am speaking. I have been polite enough not to interrupt you. And I don't have to answer questions from you. I am proceeding in accordance with the rules of civil procedure. Rule 30(d) provides that you may proceed with the deposition following my objections and directions to her not to answer the question. If you choose not to do so, you may adjourn the deposition.

Mr. Fletcher: No. We are going to be here all day asking questions, because this is going to be good today.

Coffey should not have directed the witness not to answer questions absent a pattern of annoyance or embarrassment (and the accompanying intention to seek judicial intervention), an indication that privileged information was being sought, or to enforce a previously imposed judicial limitation on discovery. Rule 30(d)(1) and (3). None of these circumstances was present.[9] The objection was based largely on relevance, so there was no basis for the instruction (and, at the present, the Court is not sure that the objection itself was well-taken). Fletcher's comments suggest he planned a combative approach to the deposition (a suggestion that is borne out by the remainder of the transcript).

*Hester Deposition, Vol. I at 13–14*

Q: In your heart, do you believe that the decision not to hire you for this job was predicated on something other than your qualifications?

Mr. Coffey: Objection. Lack of foundation.

Mr. Fletcher: She doesn't know about what her heart says? Is that your objection?

Mr. Coffey: I made my objection.

Mr. Fletcher: It is just a question. I am kind of curious.

Mr. Coffey: I am not here to answer your questions, Mr. Fletcher. I made my objection for the record.

Mr. Fletcher: It was a good objection. What rule is that? Is that 30(b)?

Mr. Coffey: You can make your snide comments all you want to. If you want to prolong the deposition by doing so, go right ahead.

Mr. Fletcher: Thanks. We are going to be here for a while.

Belittling comments in response to objections are inappropriate.[10] Plaintiff's counsel

---

9. This is but one of many instances in many depositions in which Defendant's attorneys improperly instructed witnesses not to answer questions based on their belief that the question was irrelevant or that the answer was inadmissible at trial.

10. For what it's worth, the Court believes the objection was reasonably well-founded. Asking

should have either (1) rephrased his question or (2) asked the witness for her answer; it was inappropriate to argue with opposing counsel. Equally disconcerting is the unseemly, threat-like promise that the parties would be "here for a while."

*Hester Deposition, Vol. I at 25–28*

> Q: At any time did you become aware of [KCP & L's] promise to pay Steven Stowall to lie to an EEOC attorney?
>
> Mr. Coffey: Objection. Lack of foundation
>
> Mr. Fletcher: Let's see if she has.
>
> Mr. Coffey: Your comments are really inappropriate.
>
> Mr. Fletcher: First of all, you point at me, we are going to have a problem. I don't know who you think you are. I can ask questions and I can make comments with respect to this deposition. I know you want to come in here and try to be a tough guy. I don't particularly care. I can ask her specific questions. You don't point at me.
>
> Mr. Coffey: And you are just pointing at me right now, so what is the difference?
>
> Mr. Fletcher: The difference is I am not going to be happy.
>
> Mr. Coffey: I don't care whether you are happy or not. Your function here and the purpose of the deposition under the court rules is to allow you to ask questions, not to make snide comments, not to lecture me on the law.
>
> Mr. Fletcher: I haven't lectured you on the law. You are on the expert on Rule 30, remember?
>
> Mr. Coffey: I will tell you what. Either you can ask her questions and get answers from her and stop this nonsense, or we will adjourn the deposition and we will ask Judge Smith to appoint a master for the deposition because I am not going to tolerate—
>
> Mr. Fletcher: I will tell you what, Mr. Coffey. If you think my actions have been inappropriate, you are welcome to do what you like to do. I am going to

ask her questions. If you want to get up and leave, that is fine. As I said, the rule will allow for us to come back and we will take this on your dime.

> Mr. Coffey: That is for the Judge to determine obviously.
>
> Mr. Fletcher: Please reread the question to Ms. Hester, please.
>
> Mr. Coffey: Let the record show that counsel is sitting there laughing because he thinks this is funny for some reason.
>
> Mr. Fletcher: I am laughing because—I don't think the deposition is funny. I think the whole process is funny. I think the response is funny. Frankly, I think the whole thing is funny, not the deposition. I find the deposition to be sad. Please reread the question.
>
> Mr. Coffey: I tell you what. With that in mind, we will just move for a protective order, because we are not going to have this type of behavior in depositions. We will adjourn the deposition and file a motion for a protective order and ask Judge Smith to take appropriate actions.
>
> Mr. Fletcher: We are going to stay here and take her statement.
>
> Mr. Coffey: I just adjourned the deposition, sir.
>
> Mr. Fletcher: You can adjourn it. That means you are leaving. We are entitled to stay and take this statement.
>
> Mr. Coffey: What statement?
>
> Mr. Fletcher: From Ms. Hester.
>
> Mr. Coffey: No you are not we just adjourned the deposition.

The Court need not explain why both attorneys acted shamefully during this exchange. The colloquy itself condemns counsel's conduct more strongly than anything the Court might add.

*Alexander Deposition, Vol. I at 92–98*

> Q: So you've never, in the last four years, directed anyone to destroy information from files, correct?

someone what is "in their heart" is virtually the same as asking for their "best guess" and calls for the witness to speculate. "Calls for specula-

tion" might have been more precise and more accurately preserved the objection for trial.

Mr. Singer: She's already testified that she's—

Mr. Fletcher: you know, these improper objections—I'm trying not to—make your objection, then I'll make my comment.

Mr. Singer: Mr, Fletcher, we're now here about, I don't have a watch on, looks like about 11:30.

Mr. Fletcher: This is a strange objection, but—

Mr. Singer: It's more than an objection. I'm trying to— .

Mr. Fletcher: It's just commentary.

Mr. Singer: No, I'm trying to counsel with you about trying to proceed with this matter. You've asked now a question that says something about have you ever asked somebody to destroy something. Okay, now, do you understand that is so broad to say that she walked by and said, Hey, get that newspaper off your desk— [11]

Mr. Fletcher: Are you testifying for her now, is that what you are doing?

Mr. Singer: No, I am trying to—

Mr. Fletcher: You are just giving her instructions, not testifying.

Mr. Singer: Well, I see a lot of frustration in you because of the way she's answering, and I am trying to—

Mr. Fletcher: You mean [elusively]?

Mr. Singer: No, that's your word.

Mr. Fletcher: You mean untruthfully?

Mr. Singer: The problem that you have, Sir, is that you don't have ears.

Mr. Fletcher: I don't?

Mr. Singer: Yes.

Mr. Fletcher: Like your ears?

Mr. Singer: And you don't have the courtesy to allow a person to finish what they're saying.

Mr. Fletcher: You mean like producing documents at 6:15 the night before?

Mr. Singer: And the reason you don't have the patience to do that is because you are afraid of the truth.

Mr. Fletcher: Are you done?

Mr. Singer: No, no. So what I'm asking you to do, so that we can get the information you need in your lawsuit, is to ask questions, specific questions, and not in the last four years have you asked somebody to destroy something. That question is so broad as to be meaningless. Now, I could sit here and object, and she can sit here and struggle, or if you ask—all I'm counseling you is, if you want to ask a specific question, we will go light years faster.

Mr. Fletcher: You can save your counseling for your associates, you really can. If I seek counsel, it would be from someone other than you, first of all. Secondly, the fact of the matter is the problem we're having is your client—I want her to be very clear, when we produce a witness who says she told him to pull documents from a file and shred them in this case. So I don't want you crying and whining to me when we seek sanctions against your client about her committing perjury. Now, that's why I'm trying to give her a chance here. I am trying to be very specific. And if you find that specificity troubling, then that's your problem, object all you want. I want the record to be clear as do so there won't be any attempts to say, Well, I didn't know he meant destroy anything. That's the problem. If your client would, for instance, come to a realization that a definition of can is a simple one. She is [elusive], she is not trying to answer questions. And I'm entitled to ask, and I'm entitled to get her to give me a definitive answer. I'm not going to allow her to, when we impeach her at trial, to say, Oh, I didn't know you meant shred, when she says, What do you mean by shred, What do you mean by document? It's those attempts to be cute or to be [elusive] that

---

**11.** If this was the basis for Mr. Singer's objection (which was actually stated clearly), it was not well-founded. The question was limited to destruction of *documents* that were found in *files*. Newspapers on desks would not have been implicated by the question. The question is narrower than Mr. Singer's statements suggest.

are annoying. And I'm going to get these answers. Now, she can play games all she wants, I'm happy to play games with her. The bottom line is, I'm going to get a definitive answer, one that we can then use to impeach her, one that we—if we need to, to make a criminal referral on her. We believe that she has instructed people to destroy evidence, and we believe we can put that evidence forth, as we have advised you. More importantly, we have direct testimony about other participants in this lawsuit who have directed people to destroy evidence. This is an area that we want to develop. We're going to take it before the judge and we are going to develop it there, and it may be we are going to develop it from a criminal perspective. We are entitled to get a straightforward answer. I don't want her trying to snake off the hook because I wasn't clear, I wasn't definitive. This is a person who testified previously, What do you mean by can?

Mr. Singer: Well, now that your angry display is over—

Mr. Fletcher: Give me a break. You know what, I know you think that you're some—let's go off the record.

Mr. Singer: No, I'm not off the record.

Mr. Fletcher: Okay, fine, I'll put this—I know you think you're this great guy, you know, but you are the one that plays games. You know, producing documents at 6:15 at night, that is—I know that's what they teach you in your insurance defense seminars, I know that's what they teach you, but it's not cute, you know. It's improper and unfair. We've bent over backwards to facilitate you and your demands and your little stipulations, and it's getting old. And when you bring in a client who is doing the exact same things, we're tired of it. Let's get this case moving and let's go try this. And all we see from you and your client is attempt after attempt after attempt to not be conducive, to not help, to be as unhelpful as you can. And it's not anger, it's just annoyance. In fact, it's disgust. You get this pompous attitude towards people and you act as if you can speak down to them. We want to be treated fairly. We've never delivered you documents at 6:15 at night before a deposition. We don't play that way, we play fairly. We send documents over when you want them. Subject to an objection, we clear the objection and send it over. Then when you come here and try to lecture me about badgering your client, save it, I don't want to hear it from you. . . . I don't want your lecture, no offense intended. I made millions of dollars last year. I am going to make millions this year. And at some level there has to be some correlation between what you make and what you don't make. So I don't need your lecture, save it for your children, give it to one of your associates, give it to Mr. Gingrich, give it to someone else, I don't want to hear.

After reading these exchanges, the phrase "macho posturing" comes to mind. Good lawyering includes neither condescension nor braggadocio. It should be noted that the Court has not been asked to consider charges that Alexander committed perjury, and the Court is not aware of any statement by anyone (other than Plaintiff's attorneys) suggesting that Alexander destroyed evidence.

*Alexander Deposition, Vol. III at 195–200*

Q: What were your responsibilities for reviewing the policies in connection with the periodic review of those policies?

Mr. Coffey: Objection, vague.

Mr. Klamann: Sure.

A (the witness): I can't—

Mr. Coffey: Look I don't need a commentary on my objections, John.

Mr. Klamann: Yes, you do.

Mr. Coffey: I'm entitled to make—

Mr. Klamann: Yes, you do.

Mr. Coffey:—objections, and—

Mr. Klamann: If you want to start an argument, Randy, then—

Mr. Coffey: I'm entitled to make—

Mr. Klamann: You've been ready to fight all morning long. And if you want to waste time today fighting with one an-

other and you showing all this anger, then we'll waste that time and—

Mr. Coffey: John, you—

Mr. Klamann:—get through the process in a much slower manner than we otherwise would.

Mr. Coffey: John, you know, it—

Mr. Klamann: I said—

Mr. Coffey: Now, look. Please give me the courtesy of allowing me to respond.

Mr. Klamann: I made one comment, you know, and you want to—

Mr. Coffey: It's highly improper for you to comment—

Mr. Klamann:—fly off the handle and start yelling and screaming in the deposition.

Mr. Coffey: I'm not doing that, and you know that's true.

Mr. Klamann: You absolutely are, and you know you are. Don't misrepresent your reaction on the record. Twice now in the course of this little exchange between you and me you've raised your voice and been yelling at me.

Mr. Coffey: That's because—I'm not yelling at you, John.

Mr. Klamann: Yes, you are.

Mr. Coffey: But you insist on talking over me. You and your co-counsel have never given our side the courtesy of allowing us to talk without interrupting and—

Mr. Klamann: That's just silly.[12]

Mr. Coffey: See, that's exactly what I'm—

Mr. Klamann: That's just silly.

Mr. Coffey: See, this is exactly what I'm talking about, John. And I happen to—

Mr. Klamann: If you live in a glass house—

Mr. Coffey: See, you're doing it right now John.

Mr. Klamann:—you should not throw stones.

Mr. Coffey: You're doing it right now, sir. You're talking over me. It's really unfair to the court reporter, John.

Mr. Klamann: Your hands are shaking. You need to calm down. Do you want to take a break?

Mr. Coffey: No, sir. I want you to allow me to finish my—

Mr. Klamann: Now—

Mr. Coffey: Give me the courtesy of allowing—

Mr. Klamann: You've made your objection.

Mr. Coffey: No, sir. Give me the courtesy—

Mr. Klamann: It was to the form of the question. You want to get in a big argument about your objection. You've made your objection. That's all you're entitled to do, that's all we need. I want to get on with the question.

Mr. Coffey: John—

Mr. Klamann: Let' stop all this nonsense back and forth between the two of us.

Mr. Coffey: John, when you're finished and will allow me to finish my statement, which I'm entitled to do for the record—

Mr. Klamann: Make whatever statement you want. I'm going to get some more water. Let me know when you're done.

Mr. Coffey: When you come back, I'll make my statement.

Mr. Klamann: No, you go ahead and make it, because I'm not interested in it. It's improper.

Mr. Coffey: No, your conduct is improper, sir.

[Whereupon a discussion was held off the record]

Mr. Coffey: John, my point was that I think it's improper for you to comment on the propriety of my objections or to comment about whether you think it's a valid objection. I haven't commented on the quality of your questions.

Mr. Klamann: What are your objections, if not that?

Mr. Coffey: Well, objections are what I'm entitled to make for the record, sir.

Mr. Klamann: Okay. Whatever you say.

12. The interruption at this juncture is somewhat ironic and, in other circumstances, might be humorous. As it is, the situation is simply sad.

Mr. Coffey: And you may not like my objections, but I don't need your commentary on them, quite frankly.

Mr. Klamann: Whatever you say, Randy. Whatever you say. Okay. Now, can we have the question read back for the witness? Just try to relax a little bit, and we'll get through this process.

Mr. Coffey: You know, you can quit making the gratuitous comments on the record, trying to create a record that doesn't reflect what's happened here. If you would give me the courtesy of allowing me to state what I want to state for the record and not continually interrupting me, I would appreciate it.

Mr. Klamann: Are you done?

Mr. Coffey: I'm waiting for you to proceed, sir.

Once again, the Court believes the exchange amply demonstrates condemnable conduct on the part of both lawyers.

*Alexander Deposition, Vol. IV at 439–42*

Q: All right. Well, do you know what consequences resulted from that incident at Hawthorn or at La Cygne?

A: Which incident at— [13]

Q: Either one.

Mr. Coffey: Please don't raise your voice at the witness.

Mr. Klamann: You stop that.

Mr. Coffey: No. You just raised your voice at the witness.

Mr. Klamann: You stop that, Mr. Coffey. You're doing it again, you're trying to raise a fuss, and I'm not going to go for it.

Mr. Coffey: No, you—

Q: Go ahead, Ms. Alexander. You answer the question, please.

Mr. Coffey:—you just wait. And when I'm finished making my statement, then you can answer.

Mr. Klamann: Well, the clock stops. I'm not going to tolerate any more of this nonsense where I've got to have the

question repeated multiple times and we take these long, drawn-out answers that miss the point of the question and you try to incite arguments, all of which is an attempt to run the clock.

Mr. Coffey: No, this is—

Mr. Klamann: It's all inappropriate. I object to it. I'm not going to take it from you particularly, Mr. Coffey. We're going to finish the deposition, and all of these other tactics are not going to amount to a hill of beans when it's all said and done because I'm not going to agree that these tactics are going to succeed in shortening the deposition or the time or the questions that I have.

Mr. Coffey: Are you finished, Mr. Klamann?

Mr. Klamann: So all of this nonsense has got to stop, and we're going to proceed in a workmanlike fashion to get this deposition concluded.

Mr. Coffey: Mr. Klamann, when you're finished and you allow me to make my statement—

Mr. Klamann: No. I have a question.

Mr. Coffey: No—

Mr. Klamann: Unless you have an objection, I'm going to ask a question.

Mr. Coffey: No, sir. When I finish making my statement.

Mr. Klamann: Would you read the last question back, please?

Mr. Coffey: No. We're not going to proceed in this fashion. The witness is not answering any further questions until you allow me to say what I have to say.

Mr. Klamann: All right. Go ahead.

Mr. Coffey: What I have to say, John, is that you've been badgering the witness, you've raised your tone of voice to the witness, you make winks and nods at your summer clerk who is here, and I think your conduct is inappropriate. And you can term it incitement or whatever else you like, but that conduct is not going to continue, and I'm not going to allow you to treat the witness in that

---

**13.** Hawthorne and La Cygne are two of KCP & L's facilities, and in the preceding pages of the deposition multiple incidents at both facilities had been discussed, making the witness' clarifying question extremely appropriate.

fashion. Now, if you want to ask the witness questions and continue, you may go ahead, and you may subtract my 30 seconds from your time, and we'll continue till 30 seconds after five o'clock.

Q: Let me show you what's been—

Mr. Klamann: Well, we're going to continue long after that.

Mr. Coffey: Not by our agreement. I believe the court order says—

Mr. Klamann: And by our agreement we're going to continue after that because you've taken breaks, and we agreed that I had eight hours, and eight hours isn't up at five o'clock.

The unsightly exchange continued as Klamann and Coffey argued about the reasons the deposition was taking so long, whose fault it was, and whether or not the Court was likely to allow it to be resumed. Another lengthy argument about whether to stop the deposition at approximately 5:15 p.m. appears on pages 504–14; the Court will spare the reader a replay of that scene.

As stated earlier, these are merely illustrative examples. They do not represent all of the instances of improper, rude, juvenile or downright silly conduct on the part of attorneys on both sides of the case. Space and time do not allow for an unabridged recounting.

## III. CONCLUSION

█ The Court concludes that there is plenty of blame for both parties. To state matters succinctly, Plaintiff's attorneys committed the following improprieties:

1. Spoiling for fights in depositions.

2. Being snide, rude and nasty during depositions.

3. Blaming Defendant's attorneys when responses to vague and ill-defined discovery requests and deposition requests were less than expected.

4. Failing to plan discovery in a manner that allowed it to be concluded in a timely manner, including (a) failing to leave sufficient time for depositions and (b) failing to plan for limitations on discovery imposed by the Federal Rules of Civil Procedure.

5. Charging opposing counsel with unethical and criminal conduct without just cause.

For their part, Defendant's attorneys engaged in the following improprieties:

1. Directing witnesses not to answer deposition questions in a manner that violates Rule 30(d)(1) and (3).

2. Failing to state objections during depositions "concisely and in a non-argumentative and non-suggestive manner" as required by Rule 30(d)(1).

3. Being snide, nasty and rude during depositions.

4. Failing to be agreeable to *de minimus* alterations in the discovery process without just cause.

5. Failing to timely deliver discovery responses.

6. *Sua sponte*, and inappropriately, limiting the scope of court orders in a manner favorable to Defendant.

7. Claiming lack of understanding upon receipt of Plaintiff's discovery requests, when the purpose of the requests was clear or readily discernible.

The fact that there are more items listed on Defendant's side of the ledger should not be interpreted as a conclusion that Defendant has been more culpable. The Court finds that, based on the number, nature and effect of each parties' transgressions, the level of inappropriate conduct is equal, and equally reprehensible, for both sides.

The Court has concluding thoughts about this case. Incivility between lawyers is anathema to this Court. It is a thing accursed and reviled. Once, seemingly long ago, lawyers treated one another with courtesy and respect. They parried in court but actually regarded one another highly. They ardently represented their clients without blurring the role of counselor with the role of client. Their disputes involved issues, not persons. The Court grieves with the realization that this case demonstrates that those times are long gone, perhaps never to return. It is a sad, sad day.

**664**

In over nearly thirty years of lawyering and judging, the undersigned has witnessed few episodes which approach this case in vitriolic animus. The shock is exacerbated because of the skill level of the lawyers involved. What happened here is unnecessary in any case, but certainly among lawyers as gifted as these. Without diminishing the importance of the case to the parties, it is now essentially a straightforward race discrimination lawsuit. There is absolutely *no* reason and certainly *no* excuse for the conduct displayed by counsel. The Court is at a loss to explain it. The Court doesn't even understand it. Nonetheless, it is condemned by the undersigned in the strongest possible way. Conduct of this sort cannot and will not be tolerated from these or any other lawyers.

The parties' conduct represents more than violation of court orders and rules (which in itself is sanctionable); rather, it has had serious "real world" effects. It has (1) increased the cost of litigating the case for the parties, (2) wasted judicial resources, and (3) brought dishonor upon these attorneys and the profession as a whole. The Court could exercise its inherent supervisory powers and monetarily sanction the attorneys for both parties, however the effect of that sanction would be nullified if the sanctions were paid to opposing counsel. Rather than reward either side by awarding the amount they seek, the Court deems it appropriate for each party to pay the fees resulting from their unseemly and unprofessional squabbling so as to deprive them of any benefit from their actions.

Therefore, the attorneys for each party are ORDERED to pay the amount they incurred preparing for and participating in the hearing before Judge Maughmer to the Legal Services Corporation of Western Missouri. Specifically, Plaintiff's counsel shall pay $21,356.25 and Defendant's counsel shall pay $12,201.00. In making this ruling, the Court expresses no opinion as to the reasonableness of the time expended or the hourly rate claimed by each lawyer involved; the consequence of unreasonableness falls upon the unreasonable party.

Payment of the sanction will be suspended until the case is final. Whether the suspension is temporary or permanent will depend upon the attorneys' future conduct throughout the remainder of these proceedings.

Finally, counsel are directed to provide a copy of this order to their respective clients and certify to the Court that they have done so within ten (10) days of this Order. Counsel for KCP & L shall comply with this directive by providing a copy of the Order to the Chief Operating Officer of KCP & L.

IT IS SO ORDERED.