# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 04-2636

_____

| | | |
|---|---|---|
| In Re: Disciplinary Matter of | * | Appeal from the United States |
| Michael Robert Fletcher, | * | District Court for the |
| | * | Western District of Missouri. |
| Appellant. | * | |

_____

Submitted: April 14, 2005
Filed: September 23, 2005

_____

Before RILEY, FAGG, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

The United States District Court for the Western District of Missouri ("Western District")[1] suspended Michael Robert Fletcher from the practice of law before that court for three years for numerous violations of the Missouri Rules of Professional Conduct, which apply to practice before the Western District. W.D. Mo. R. 83.5(c)(2). Fletcher appeals, arguing that the Western District erred in expanding the scope of the investigation into his misconduct beyond the facts that triggered the disciplinary proceedings, that two district judges should have recused themselves from the proceedings against him, and that the Western District denied Fletcher adequate pre-trial discovery. Fletcher also contends that the Western District erred

---

[1]The United States District Court for the Western District of Missouri, sitting en banc.

in some of its findings of misconduct and that the sanctions imposed were too harsh given the circumstances of his case.  We affirm.

## I.    BACKGROUND

Fletcher is an attorney with the firm of Simpson Sanders & Fletcher, L.C. in Kansas City, Missouri.  He specializes in the area of employment discrimination.  He was admitted to the Missouri bar on October 10, 1996, and to the Western District bar on May 20, 1998.  Fletcher has a history of using ethically questionable tactics in litigation.  In 2000, Western District Judge Ortrie D. Smith described Fletcher's conduct in depositions as "combative" and "macho posturing," in part because of comments that were "belittling" and "threat-like."  *Ross v. Kansas City Power & Light Co.*, 197 F.R.D. 646, 657-58, 660 (W.D. Mo. 2000).   Shortly thereafter, Western District Judge Scott O. Wright criticized Fletcher for using "race baiting" tactics in another case.  *See* Mark Morris, *Judge Denounces Lawyer's Comments; Police Settlement Split among Family*, KANSAS CITY STAR, Oct. 12, 2000, at B1.

### A.    Turner Litigation

On August 25, 2000, Fletcher filed a lawsuit for a client, William Turner, in the Western District against Honeywell Federal Manufacturing & Technologies LLC ("Honeywell").  The lawsuit ("Turner litigation") alleged that Honeywell had denied Turner promotions on the basis of race.  Early in the Turner litigation, the parties participated in mediation under the Western District's Early Assessment Program.  As the mediation session concluded, Fletcher began directing profanities at Jill Marchant, Honeywell's in-house counsel, and Karen Cain and William Martucci, Honeywell's outside counsel.  Among other things, Fletcher accused Marchant of being a "fucking liar."  Needless to say, the parties were unable to resolve the case in mediation.

In conjunction with the Turner litigation, Daniel Craig, an associate working for Fletcher, deposed Karen Clegg, former president of Honeywell, on June 11, 2001. Craig asked Clegg whether she had made a comment that "the white man is an endangered species at Honeywell."

Craig:     Okay. Do you recall being in a management meeting in approximately early 1999 where you made a comment, in fact, wrote on a board something to the effect that the white man is an endangered species at Honeywell?

Clegg:     I don't know when – what year that would have been made. I do recall that we provided diversity training to associates, and the trainers, and I happened to be one of the trainers, set out a chart, I believe it was, of perceptions that people had about each other, perceptions that are typically inaccurate and that may have – I believe that one of the statements on the presentation material that was prepared for the trainers.

Craig:     But did you actually say something to that effect?

Clegg:     I think it was on the chart and I stated that was a perception. I certainly never presented it as my perception. As I said, it was part of diversity training to understand how people misperceive each other.

Fletcher deposed Jimmie Banks, former Honeywell Manager of Human Resources Services and Diversity, on June 22, 2001. During the deposition of Banks, Fletcher asked a number of pointed questions about vernacular allegedly used in the African-American community. The following exchange is representative of Fletcher's behavior during the deposition of Banks:

Fletcher:  Now do you think if I were to refer to your wife as a nigger bitch that would be highly offensive?

Banks:    Yes, sir.

Fletcher:    Okay.  And why would it be highly offensive?

Banks:    Because of the nature of the term.

. . .

Fletcher:    Okay.  Now, tell me why you think the term nigger bitch would be offensive.

Banks:    In our culture, bitch is referred to as a female dog.  In our culture, the word nigger in certain contexts is an offensive term.  And you put those two together and you have very offensive identifiers.

Fletcher:    Now tell me a context in which it's okay to refer to an African American as a nigger.

Banks:    I don't know of any.

Fletcher:    Didn't you just testify, sir, that, quote in certain contexts it's offensive?

Banks:    Well, as I see it personally, it's always offensive.  In terms of how certain people might use it, it could be a term of affection in our culture.

Fletcher:    When you say "our culture," what do you mean?

Banks:    In our culture.  Black culture.

Fletcher relentlessly pressed this line of questioning until Honeywell's counsel objected.  As part of the exchange between attorneys and in the presence of the witness, the plaintiff, the court reporter and others, Fletcher characterized Banks's testimony as follows:  "The fact that this man has testified that for 40 years he refers

to African Americans as niggers, the fact that this man has testified that for 40 years he found it a compliment to be referred to as nigger is shocking." Fletcher added, "This man, in my opinion, has done nothing but step on the backs of black people at Honeywell so he can get further, he could be further ahead." The tirade concluded with Fletcher calling Banks a "self-hating racist" and comparing him to those "Jews that were willing to turn in other Jews to [the Nazis to] protect themselves."

## B. Honeywell Complaints

Fletcher eventually learned of several additional individuals who claimed they also suffered racial discrimination at the hands of Honeywell. Initially, Fletcher sought to join these individuals as additional plaintiffs in the Turner litigation. However, after the district court denied his request, Fletcher filed eighteen separate complaints against Honeywell on behalf of these new plaintiffs (the "Honeywell complaints"). These cases then were assigned to numerous judges in the Western District, except Judge Smith, who had recused himself under 28 U.S.C. § 455 from the one case that was assigned to him.

As in the Turner litigation, neither Clegg nor Banks were named as defendants or accused of any wrongdoing. Nonetheless, each of the eighteen complaints contained inaccurate and misleading allegations purportedly based on the deposition testimony that Clegg and Banks gave during the Turner litigation. For example, the Honeywell complaints contained the following with regard to Banks:

> b. [Banks testified that r]eferring to an African-American as a **nigger**, "could be a **term of affection** in our culture." p.7;
>
> c. "It can be a **compliment** if I say **you're my nigger**," to an African-American. p.8-9;

d.    He himself has several people who compliment him by calling him a nigger. p.9-10;

e.    He **enjoys being called a nigger** by these people. p.10-11;

f.    It makes him **happy** when these **people call him a nigger**. p.14;

g.    Non-African Americans may **call him a nigger** without offending him. p.22;

h.    Use of the word **bitch** towards a female can be a **term of endearment** in "our culture." p.23; and,

i.    Use of the term **nigger bitch** in reference to an African-American female "may be an acceptable expression that people use." p.24.

Complaint at 5, *Brown v. Honeywell Fed. Mfg. & Techs., LLC*, No. 02-CV-219 (W.D. Mo. Mar. 12, 2002) (emphasis in original).

Absent from Fletcher's selective quotations was much needed context. For example, with respect to subparagraph i, Banks actually gave the following testimony:

Fletcher:    Okay. Now, so if it's okay to refer to African Americans as niggers and okay to refer to African American females as bitch, why would you be offended if someone referred to your wife or daughter as a nigger bitch?

Banks:    I think I've responded to the nature of your question, and what you're doing is tying two things together to try to make it sound like I've said something that I actually haven't said.

Fletcher:    Okay. Well, is it okay to refer to your wife or daughter as a nigger bitch?

Banks:      I told you the terms are highly offensive, but two people who have a relationship, that may be an acceptable expression that people use.

Fletcher:   Okay.  Tell me a scenario in which it's acceptable to refer to an African American female as a nigger bitch?

Banks:      As far as I am personally concerned, there are none.

As is clear from the transcript, Banks testified that he found the terms "nigger" and "bitch" to be highly offensive and inappropriate.

The Honeywell complaints signed by Fletcher similarly distorted the deposition testimony of Clegg.  For example, the complaint stated that:  "[Clegg] admits that she told a group of management employees in a meeting at Honeywell that **"the white man is an endangered species at Honeywell."**  Complaint at 10, *Brown*, No. 02-CV-219 (emphasis in original).  However, as is clear from her deposition testimony, Clegg stated this was an example of "how people misperceive each other."

Honeywell moved to strike the portions of the complaints that involved its executives' deposition testimony on the grounds that the allegations were impertinent and scandalous.  Judge Gary A. Fenner, the first judge to take up this issue, found that the offending paragraphs were "impertinent, scandalous, and taken out of context so as to be misleading."  *Samuel Coleman v. Honeywell Fed. Mfg. & Techs., LLC*, No. 02-CV-362, slip op. at 1 (W.D. Mo. June 18, 2002).  One month later, Judge Wright entered a similar order in a Honeywell litigation case before him, finding that "with respect to the deposition testimony, plaintiff's counsel has taken statements out of context and mischaracterized other testimony beyond recognition."  *Combs v. Honeywell Fed. Mfg. & Tech., LLC*, No. 02-CV-220, slip op. at 2 (W.D. Mo. July 26, 2002).  Both judges ordered the complaints to be amended without the offensive deposition-related allegations.  Fletcher amended the two complaints before Judges Fenner and Wright but did not amend the complaints pending before other judges.

In September, Judge Howard F. Sachs granted Honeywell's motion to strike, stating that the offending paragraphs "consist of conclusory allegations, at best, and fraudulent mischaracterizations at worst." *Barbara L. Coleman v. Honeywell Fed. Mfg. & Techs., LLC*, No. 02-CV-361, slip op. at 1 (W.D. Mo. Sept. 5, 2002). One month later, Judge Nanette K. Laughrey granted, without substantive analysis, Honeywell's motion to strike, holding that the issue had been "ably addressed by Judge Fenner and Judge Wright in parallel actions." *Brown v. Honeywell Fed. Mfg. & Techs., LLC*, No. 02-CV-219, slip op. at 4 (W.D. Mo. Oct. 3, 2002).

## C.    Complaints of Misconduct

Initially, Chief Judge H. Dean Whipple notified Maridee F. Edwards, Chief Disciplinary Counsel for the State of Missouri, that Judges Smith and Fenner had "voiced complaints about the unprofessional and abusive conduct of Michael R. Fletcher in cases before them." Edwards declined to exercise jurisdiction over the issues involving the Western District, instead leaving the matter to the Western District.

On November 7, 2002, Chief Judge Whipple granted yet another Honeywell motion to strike and ordered Fletcher to show cause why he should not be sanctioned. The order to show cause was based on his finding that "[Fletcher] has shamelessly included scandalous allegations" that were "inaccurate, misleading, and inflammatory." *Smith v. Honeywell Fed. Mfg. & Techs., LLC*, No. 02-CV-234, slip op. at 3. The only reason Chief Judge Whipple could find for the inclusion of these allegations was to "harass and embarrass Honeywell management and to shamelessly publicize this case in the media prior to trial." *Id.* at 6.

> The Court can find no legitimate reason why [Fletcher] would include these allegations in a pleading to this Court. Even if these allegations were true–and the context of the depositions show they are not–these allegations are irrelevant and immaterial to the claims set forth in the

lawsuit. Plaintiff claims she was discriminated against by not being promoted, but does not allege that either Banks or Clegg was involved in the advancement decisions relating to her.

*Id.* at 6.

Although Fletcher filed a brief opposing sanctions and Honeywell filed a brief in support, Chief Judge Whipple made no further ruling on the show cause order. Instead, the Western District sent a letter to Fletcher on January 9, 2003, notifying him that Judges Fenner and Smith had referred allegations of misconduct against Fletcher pursuant to Local Rule 83.6(d). The letter explained that particular allegations prompting an investigation and possible disciplinary proceedings "stem from your representations to the Court in the Honeywell complaints and comparisons with the actual transcripts of the testimony cited." The letter stated that the Western District had appointed Theresa Levings ("Appointed Counsel") to investigate whether Fletcher had violated Missouri Rule of Professional Conduct (Mo. RPC) 4-3.3 (requiring candor toward the tribunal) or Mo. RPC 4-8.4 (prohibiting conduct that is prejudicial to the administration of justice) when he filed the Honeywell Complaints. The letter also notified Fletcher that Appointed Counsel would investigate "other conduct or allegations that may come to her attention during the course of her investigation."

### D.    The Investigation

Appointed Counsel deposed Fletcher on May 23, 2003. During the deposition, Fletcher acknowledged four outstanding bar complaints against him. Three of these related to assertions Fletcher allegedly made to class representatives in a suit against Rent-a-Center. The fourth complaint involved allegations of bribery, assault and resisting arrest.

Appointed Counsel also mailed letters throughout the Kansas City legal community in order to ascertain whether Fletcher had acted improperly at other times in his career. Her investigation uncovered numerous other instances of Fletcher's demeaning and abusive behavior while participating in depositions and mediation. For example, during the mediation with St. Joseph Health Center of a case involving race discrimination and wrongful discharge, Fletcher threatened to publicize confidential patient information that his client had illicitly photocopied. In another instance of professional misconduct, Fletcher left threatening phone messages at the home and office of Laura Lesniewski, an architect with Habitat for Humanity. Fletcher promised to seek sanctions and bring a lawsuit for Lesniewski's "improper and unethical negotiations with [Billy Duncan, his] former client." Such threats were hollow and improper because Fletcher knew that Lesniewski was not an attorney bound by the rules that regulate contact with represented parties.

As a final example, Fletcher employed demeaning and inappropriate tactics during the deposition of Steven J. Cox, former police chief of the Leawood Police Department. After Cox had stated that he believed a prior incident of rape occurred sometime in 1989, 1990 or 1991, Fletcher pursued the following line of questioning:

Fletcher:   Okay. So you can recall when you graduated high school, but you can't recall when one of your women employees was raped by another employee?

Cox:   That's correct.

Fletcher:   All right. Is that because the high school graduation had more significance to you than the rape of Miss Gibbs?

. . .

Cox:   I – to – as far as a personal milestone in my life, yes, probably so.

Fletcher: Okay. And that is because your graduation from college had more significance to you than Mrs. Gibbs' rape by an officer?

Cox: No, sir.

Fletcher: Okay. Why don't you recall the date of Miss Gibbs' rape?

Cox: Those are also events that people traditionally associate with a year.

. . .

Fletcher: Also, ironically, you remember the decade you graduated from high school, but you can't remember the decade Miss Gibbs was raped, correct?

Fletcher later shifted gears in the deposition and began to threaten both the deponent and his attorney, Rebecca Yocum.

Fletcher: Does she represent you in your 19 – are you aware, sir, that there's a 1983 cause of action filed against you personally?

Cox: No, sir.

Yocum: First of all, sir, that is a misstatement. There is no such action.

Fletcher: Okay. Are you aware that there's an amended complaint in which you are cited specifically under section 1983 of the Civil Code?

Yocum: And you're misstating the record. There is no amended complaint that has been allowed to be filed.

Fletcher: Did she tell you that? Are you aware of that? . . . You can answer.

Cox: No, sir.

Fletcher: Okay. So are you aware that if she's representing you that you may have personal liability in this matter?

Yocum: Mr. Fletcher, you're misrepresenting the facts. Mr. Cox has not been named as a defendant in this litigation, period. And I resent the fact that you're misrepresenting things to him.

Fletcher: Sir, have you been advised that there's a lawsuit pending or a proposed amendment to the complaint which would potentially involve you personally in liability?

Cox: No, sir.

Fletcher: Is that a fact that you would have liked to have been advised of?

Yocum: Mr. Fletcher, you're misstating facts to him. Stop it. There is no litigation against Chief Cox – former Chief Cox in this litigation.

Fletcher: I don't know why you are getting upset. I'm simply asking him questions –

Yocum: I am upset because you are lying, sir. You are lying to the man. If there's some litigation pending –

Fletcher: You don't ever – you are – this is the second attack by you people, for you to call me a liar. This is done and we're taking it up with the judge.

-12-

Yocum:     That's fine, sir. But you've totally misrepresented the facts to this man. There is no litigation personally pending against Chief Cox.

Fletcher:   For you to attack – for you to attack a member of this Court and call him a liar just bought you a lawsuit. Let's go.

These and numerous other allegations paint a disturbing picture of an over-zealous attorney who frequently resorts to unprofessional tactics in an attempt to harass, humiliate and intimidate deponents and their counsel.

## E.     Disciplinary Proceedings

On October 17, 2003, Appointed Counsel filed with the Western District a Motion for Order to Show Cause Why Michael Robert Fletcher Should Not Be Disciplined for Professional Misconduct ("motion for order to show cause"). The motion contained 157 counts of misconduct, which stemmed from 307 factual allegations. One week later, Chief Judge Whipple issued an order to show cause, which Fletcher answered on December 29, 2003. Pursuant to W.D. Mo. R. 83.6(d)(4), Chief Judge Whipple assigned the matter for a hearing before Judges Fernando J. Gaitan, Jr., Laughrey and Richard E. Dorr.

The three-judge panel convened on March 8, 2003, to hear three days of testimony and arguments. Two months later, the three-judge panel issued a Report of Findings and Recommendation ("report and recommendation"). According to the three-judge panel, Appointed Counsel proved by clear and convincing evidence 167 of the 183 factual allegations the panel considered.[2] Based on the findings in the

_____

[2]The panel stated that it chose not to consider factual allegations 184-307 because it concluded "there was sufficient evidence of professional misconduct contained in paragraphs 1-183 of Appointed Counsel's Motion for the court to take the necessary action to preserve the integrity of this court."

report and recommendation, the three-judge panel concluded that Fletcher had violated the Missouri Rules of Professional Conduct and that a three-year suspension was appropriate. On May 18, 2004, the United States District Court for the Western District of Missouri, sitting en banc, issued an order ("the en banc order") accepting the three-judge panel's factual findings and adopting its recommendation for sanctions.

## F.     Western District's En Banc Order

The Western District's holdings fall into three basic categories. First, the court ruled that Fletcher made misrepresentations to the court in violation of Mo. RPC 4-3.3(a)(1) (making a false statement of fact to the tribunal) and 4-8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); second, that Fletcher engaged in conduct with no substantial purpose other than to intimidate and harass third parties in violation of Mo. RPC 4-4.4 (respecting the rights of third persons); and third, that Fletcher engaged in conduct prejudicial to the administration of justice in violation of Mo. RPC 4-8.4(d).   The Western District summarized:

> While each and every action by Mr. Fletcher which has been proven by clear and convincing evidence may not constitute a separate ethical violation, the court is firmly convinced that Mr. Fletcher has engaged in a pattern and practice of unethical conduct and has done so to gain an unfair advantage in litigation and to profit financially.  He has also exhibited disregard for the authority of the federal court.

*In re Disciplinary Matter of Michael Robert Fletcher*, No. 03-272, slip op. at 5-6 (W.D. Mo. May 18, 2004) (en banc).  As a mitigating factor, the Western District noted that witnesses testified that Fletcher is a talented attorney who lacks appropriate guidance and training and that he is passionate about his clients' causes and has used some of his own money to pursue those causes.  The Western District concluded,

-14-

however, that "[w]hile Mr. Fletcher may possess some talent as an attorney, neither talent nor causes entitle him to violate the professional codes of conduct." *Id.* at 6.

Accordingly, the en banc district court suspended Fletcher from practice before the Western District for three years, effective immediately. The en banc order provides that Fletcher is subject to reinstatement only pursuant to W.D. Mo. R. 83.6(f), which requires him to petition the court and show by clear and convincing evidence that "[he] has the necessary integrity, moral qualifications, and competency for readmission." Fletcher appeals, arguing that his due process rights were violated because (1) the Western District considered conduct outside of the Honeywell complaints, (2) the judges who initiated the disciplinary proceeding did not recuse themselves from joining the en banc order, (3) Judge Smith did not recuse himself from the en banc order despite his recusal from the litigation that gave rise to the disciplinary action, and (4) limitations on pre-hearing discovery prejudiced Fletcher. Fletcher also contends that (5) the Western District erred in its factual findings and (6) imposed an excessive punishment upon Fletcher.

## II.    DISCUSSION

### A.    Due Process

"Courts have long recognized their authority to suspend or disbar attorneys, an inherent power derived from the attorney's role as an officer of the court that granted admission." *In re Hoare*, 155 F.3d 937, 940 (8th Cir. 1998). As such, a court's power to discipline members of its bar is "autonomous." *In re Attorney Discipline Matter*, 98 F.3d 1082, 1087 (8th Cir. 1996) (citing *Theard v. United States*, 354 U.S. 278, 281 (1957)). The exercise of this "autonomous" authority is, however, limited by the constitutional requirements of due process. *See Schware v. Board of Bar Exam. of State of N.M.*, 353 U.S. 232, 238-39 (1957) (noting that a court cannot exclude a person from the practice of law in a manner that contravenes the Due

-15-

Process Clause of the Fourteenth Amendment). In an attorney disciplinary proceeding, due process requires, at a minimum, "notice and an opportunity to be heard," *Charges of Unprofessional Conduct against 99-37 v. Stuart*, 249 F.3d 821, 825 (8th Cir. 2001), and that the district court follow its "procedural rules governing attorney discipline," *In re Bird*, 353 F.3d 636, 638 (8th Cir. 2003).

Rule 83(d)(1) of the Western District's local rules provides that "[w]hen misconduct or allegations of misconduct . . . come[s] to the attention of a Judge of [the] Court, . . . the judge shall refer the matter to counsel for investigation and the prosecution of a formal disciplinary proceeding." W.D. Mo. R. 83.6(d)(1); *see also* W.D. Mo. R. 83.6(h) ("[The] Court shall appoint as counsel one or more members of the Bar of [the] Court to investigate allegations of misconduct or to prosecute disciplinary proceedings under these rules . . . ."). If, after investigation and review, the appointed counsel concludes that a formal disciplinary proceeding should not be initiated, she must file a recommendation for disposition with the Western District. W.D. Mo. R. 83.6(d)(2). If, however, the appointed counsel concludes that formal disciplinary proceedings should be initiated, she must "obtain an order of [the] Court upon a showing of probable cause requiring the respondent-attorney to show cause within 30 days . . . why the attorney should not be disciplined." W.D. Mo. R. 83.6(d)(3). A respondent-attorney is entitled to a hearing "if any issue of fact is raised [in the respondent-attorney's answer to the order to show cause] or the respondent-attorney wishes to be heard in mitigation." W.D. Mo. R. 83.6(d)(4). Where "the disciplinary proceeding is predicated upon the complaint of a judge of [the] Court, the hearing shall be conducted before a panel of three other judges of [the] Court appointed by the Chief Judge." *Id.*

The Western District and Appointed Counsel assiduously complied with the procedures established in the Western District's local rules. Judges Smith and Fenner complained of Fletcher's improper litigation tactics to Chief Judge Whipple. Chief Judge Whipple then appointed counsel pursuant to the procedures established in W.D.

Mo. R. 83.6(h).   After conducting an exhaustive investigation of Fletcher's misconduct, Appointed Counsel initiated formal disciplinary proceedings by filing a 136-page motion for order to show cause, which also served to notify Fletcher of specific factual allegations and formal charges of misconduct.  Fletcher responded to the charges, and the matter was set for hearing before a three-judge panel that properly did not include either of the complaining judges.  The three-judge panel heard testimony from witnesses for both Appointed Counsel and Fletcher.  The three-judge panel then filed a report and recommendation, which was adopted in full by the en banc court.

### 1.    Scope of the Investigation

First, Fletcher argues the scope of Appointed Counsel's investigation should have been limited to "'allegations of misconduct' that came 'to the attention of a Judge of th[at] Court' prior to the appointment."  Appellant's Opening Brief at 16, No. 04-2636 (8th Cir. 2005) (quoting W.D. Mo. R. 83.6(d)(1) & (h)).   To the contrary, there is simply no language in Western District's local rules that limits the scope of an appointed counsel's investigation to allegations of misconduct known to the court "prior to the appointment."  Appointed Counsel's search for information from those in the Kansas City legal community regarding other instances of Fletcher's professional misconduct was not only consistent with the terms of her appointment, but was indispensable in determining whether Fletcher's conduct during the Honeywell litigation was an isolated violation of the ethical rules.  Indeed, the Western District even informed Fletcher of Appointed Counsel's investigation. *See In re Flanagan*, 690 A.2d 865, 873 (Conn. 1997) (noting that, during the investigatory phase, the Due Process Clause does not require notice of the sanctionable charges). Appointed Counsel also informed Fletcher of new allegations as they were discovered during the course of her investigation.

## 2.    Recusal of Judges Smith and Fenner

Second, Fletcher argues that the failure of the complaining judges, Judges Smith and Fenner, to recuse themselves from the en banc order violated his due process rights. We disagree. Local Rule 83.6(d)(4) requires only that the disciplinary hearing be conducted before a panel of three judges of the Western District, none of whom referred a predicate complaint. Neither Judge Smith nor Judge Fenner participated in the three-judge panel that heard testimony, found Fletcher guilty of professional misconduct and recommended sanctions.

There is nothing to suggest that the participation of the complaining judges in the subsequent en banc order was improper. The Western District's local rules do not limit a complaining judge's role in a disciplinary matter after the three-judge panel makes its findings and recommendation. In general, doubt as to the impartiality of a judge arises where "the judge [has] demonstrated bias or personal prejudice to the parties." *A.J. by L.B. v. Kierst*, 56 F.3d 849, 862 (8th Cir. 1995). A judge's opinion of an attorney is wrongful or inappropriate where "it is undeserved, or . . . rests upon knowledge that the subject ought not to possess . . . or because it is excessive in degree." *Liteky v. United States*, 510 U.S. 540, 550 (1994). At most, Fletcher can show only that Judges Smith and Fenner suspected him of professional misconduct as a result of his conduct in matters before the Western District. No evidence suggests that Judges Smith and Fenner formed opinions of Fletcher that were undeserved, based on improper knowledge or excessive in degree.

Even if we were to hold that Judges Smith and Fenner should have recused themselves from the en banc order, we would find the error to be harmless. *See Bird*, 353 F.3d at 638 (applying harmless error analysis to district courts' failure to follow precisely their procedural rules governing attorney discipline). The en banc court unanimously accepted the three-judge panel's factual findings and adopted the recommended sanctions. Because the en banc order did not amend the findings or

recommendations made by the three-judge panel, Fletcher cannot demonstrate that Judge Smith's and Judge Fenner's participation in the en banc order prejudiced the investigatory or adjudicatory process.

### 3. Recusal of Judge Smith

Fletcher also argues that because Judge Smith recused himself from the Honeywell litigation, Judge Smith was prohibited from participating in the decision to initiate disciplinary proceedings. Again, we disagree. We do not know why Judge Smith recused himself from the Honeywell litigation, and we are not inclined to accept Fletcher's invitation to speculate. Second, Fletcher has failed to demonstrate how Judge Smith's concern over Fletcher's professional misconduct was tainted by his decision to recuse himself from the Honeywell litigation. Indeed, we believe that professional misconduct should be a matter of concern not only for the judges of the Western District, but for all those admitted to practice before the court. Regardless, the Honeywell litigation and Fletcher's disciplinary proceedings are distinct matters presenting different considerations for recusal. We also note Judge Smith's concern over Fletcher's behavior as an attorney was apparent as early as the Ross case in 2000. *See Ross*, 197 F.R.D. at 657-58, 660. Finally, as discussed above, we do not agree that Fletcher suffered any bias or prejudice from Judge Smith's participation in the decision to initiate an investigation or in the en banc order.

### 4. Pre-Hearing Discovery

Finally, Fletcher argues that the limitations on pre-hearing discovery placed on him by the three-judge panel violated the Due Process Clause. Once again, we disagree. The motion for order to show cause included a clear enumeration of the charges against Fletcher and a thorough explanation of the bases for those charges. As a result, Fletcher was on notice of the charges against him prior to the disciplinary hearing. Prior to the hearing, the three-judge panel gave Fletcher the opportunity to

engage in reasonable discovery. Fletcher, however, made vague and unnecessary requests for discovery, such as requests to depose Judges Smith and Fenner, Appointed Counsel and Maridee Edwards, which the three-judge panel denied. During the hearing, Fletcher was able to cross-examine witnesses and call witnesses of his own. After reviewing the transcript of the disciplinary hearing, we are confident that the Western District afforded Fletcher every protection of the Due Process Clause when it gave him notice of the charges of misconduct, an opportunity to engage in discovery and a hearing on the charges against him. *See Stuart*, 249 F.3d at 825 (finding no due process violation in the denial of a discovery request because "[a]ttorney discipline procedures require notice and an opportunity to be heard, but they do not require all the constitutional protections provided in criminal prosecutions").

## B.    Western District's Factual Findings and Conclusions

Fletcher also challenges the Western District's substantive findings of misconduct. We review the district court's disciplinary order for abuse of discretion. *In re Hoare*, 155 F.3d at 940. After carefully reviewing the record on appeal, we conclude that there is sufficient evidence to support the Western District's multiple findings of professional misconduct by Fletcher. In particular, we agree that by selectively quoting deposition testimony in a way that grossly mischaracterized deponents' statements, Fletcher went beyond zealous representation into deceptive and misleading practices. Accordingly, we affirm.

## C.    Sanctions

Finally, Fletcher challenges the length of his three-year suspension from practice before the Western District. The district court, like a state's highest court, is given "considerable leeway in meting out the sanctions imposed." *In re Hoare*, 155 F.3d at 941 (quotation omitted). We review the terms of a disciplinary order for

abuse of discretion. *In re Olkon*, 795 F.2d 1379, 1384 (8th Cir. 1986). Given the pervasiveness of the misconduct and Fletcher's refusal to accept responsibility for his actions, we are convinced that the Western District did not abuse its discretion in imposing the three-year suspension.

## III.  CONCLUSION

For the reasons discussed above, we affirm the Western District's en banc order suspending Fletcher from the practice of law before that court for three years.

_____